UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

THOMAS A. KOLESAR,

             Plaintiff,

v.

UNITED AGRI PRODUCTS, INC.;
and UAP DISTRIBUTION, INC., f/k/a
Grower Services Corporation (New
York) d/b/a UAP Great Lakes,

             Defendants.

_____/

Case No. 5:04-CV-138

Hon. Richard Alan Enslen

**OPINION**

"Chemistry . . . is one of the broadest branches of science, if for no other reason, when we think about it, everything is chemistry."  Luciano Caglioti, *The Two Faces of Chemistry*, xv (MIT Press 1985).

**BACKGROUND**

This matter presents disputed motions *in limine* and a summary judgment motion for resolution.  The suit was filed on or about August 5, 2004 in the Circuit Court for Ingham County, Michigan alleging negligence on behalf of Defendants United Agri Products, Inc. and UAP Distribution, Inc. in the injury of a business invitee, Plaintiff Thomas A. Kolesar.[1]  On September 2, 2004, Defendants timely removed the suit to this Court pursuant to 28 U.S.C. § 1441 because of federal diversity jurisdiction under 28 U.S.C. § 1332.  Plaintiff is a citizen of Pennsylvania.  Defendants are citizens of Delaware and Colorado (UAP) and New York and Colorado (UAP Great

_____

[1] Other legal claims (Counts 2-4) were also asserted, but have been abandoned by Plaintiff.  (Pl.'s Br. in Opp'n 20.)

Lakes), respectively.  (*See* Notice of Removal ¶ 2.)  The amount in controversy exceeds $75,000.  (*Id.* at ¶ 4.)   The alleged negligence involves a spill of liquid fertilizer--sodium methyldithiocarbamate[2]-- delivered to Defendants' facilities in Plainfield, Wisconsin.[3]  (Compl. ¶¶ 15-18.)   The State of Michigan was not involved in the incident except for the irrelevant happenstance that Plaintiff's employer (not a party to the suit) is located in Michigan.

Metam sodium (chemical formula $C2\text{-}H4\text{-}N\text{-}S2.Na$) (HSDB No. 1767) is a white, crystalline non-flammable pesticide and fumigant.  (Hazardous Substances Data Bank, Schaible Dep. Ex. 13 at 1, 3.)  In this case, the metam sodium was in the form of a 42- percent metam sodium solution with 58 percent inert ingredients.  (Kolesar Dep., Ex. 28 at 1.)  According to one of Plaintiff's expert, the solution was basic with a pH reading of between 9 and 11.  (Ronald Schaible Prelim. Report 1.)  The exact pH is probably above 9.5, which is the breakpoint at which metam sodium begins to decompose to methyl isothiocyanate and hydrogen sulfide in an unconcentrated solution.[4]  (Hazardous Substances Data Bank 8.)  This decomposition is important because the product works by the action (toxicity) of the methyl isothiocyanate (known as "MITC" for short).   (Peggy Brady Report 4.)  Metam sodium takes some time to decompose at pH levels of 7 or above. (*Id.*; Hazardous Substances Data Bank 8.)  Add some soil to the mixture, though, which is typically at a pH below

---

[2]The parties generally refer to the substance by its chemical short-hand–metam sodium.

[3]As far as the Court can tell, there is no basis for venue in this District or in the State of Michigan.  While Defendants do maintain offices in the State, as they do throughout much of the United States, these offices had nothing to do with the alleged injury to Plaintiff.  It appears, rather, that this suit was set in Michigan as a matter of convenience to Plaintiff's attorneys–who themselves reside in Lansing, Michigan.  While the Court has contemplated dismissal of this action pursuant to 28 U.S.C. § 1406 due to improper venue, the dismissal on the merits preempts that issue.

[4]In an acidic solution, it decomposes to carbon disulfide and methyl amine.

7, and the decomposition is rapid.  (*Id.*)  The chemical properties of metam sodium thus both explain

its effectiveness as a fertilizer (it remains relatively stable until combined with soil and then rapidly

decomposes) and the precautions urged by the manufacturer and the Government to prevent its

absorption and decomposition on and within the human body.[5]

As for its dangers, metam sodium is classified by the Government as an Acute Toxicity

Category III substance as well as a skin and eye irritant.  (Brady Report 4.)  While this is nothing to

be trifled with, neither is it ranked as the most toxic of hazardous substances–for which the

Government reserves the ranking of Category I.  Indeed, metam sodium is very widely used in

agriculture with minimal complaints about toxicity.  It is the third most widely used pesticide with

some 51 million pounds applied in agriculture on a yearly basis.  (*Id.*; EPA Notice of Metam Sodium

Risk Assessment, 70 Fed. Reg. 53795, 53796 (Sept. 12, 2005).)

Most of what is known about the toxicity of metam sodium comes from either animal testing

or a large scale train-car accident which occurred on July 14, 1991.  Then, near Dinsmuir, California,

a tank car filled with metam sodium solution derailed and lost 19,000 gallons to the Sacramento

River.  J. Cone *et al.*, *Persistent Respiratory Health Effects After a Metam Sodium Pesticide Spill*,

106 Chest 500, 500 (Aug. 1994).  The resulting combination of MITC and hydrogen sulfide killed

virtually all aquatic life on a 40-mile stretch of the River, which emptied into Lake Shasta.  (*Id.*)

Prisoners who were sent to pick up the dead fish suffered contact dermatitis.  (*Id.* at 501.)  Nearby

_____

[5]Once it is understood that lower pH levels speed the decomposition of metam sodium to
MITC, it is apparent that contact with organic bodies, particularly at lower pH levels, is likely to
further both decomposition and bodily injury.  The skin naturally is acidic (with a pH around 5.5
or below) so skin contact is likely to further decomposition.  (*See* Hazardous Substances Data
Bank 4--advising that decomposition occurs when metam sodium is combined with sweating wet
skin).)

residents also suffered contact dermatitis, burning eyes, nausea, headache, coughing and wheezing. (*Id.*)  During this time period, the winds were blowing MITC into the air, and Lake Shasta was being aerated to prevent ecological damage.  (*Id.* at 500.)

The subsequent 1994 medical study of the exposure victims identified 20 individuals who suffered persistent respiratory difficulties induced by the spill (these 20 were classified with a diagnosis of either persistent irritant induced asthma or reactive airways dysfunction syndrome (RADS)) and 10 who were identified as having pre-existing asthma which was exacerbated by the spill.  (*Id.* at 503.)  This is from a total of 197 patients who were evaluated.  (*Id.*)  The first group, which included RADS patients, deliberately did not include the second group because of the pre-existing history of asthma.  This was not accidental.  The American College of Chest Physicians defines RADS using a seven-element definition which excludes patients with a prior history of respiratory complaints.  (Brady Report 9.)  Of the first group, only six were treated with either steroids and/or beta-agonists.  (Cone, *Persistent Respiratory Effects,* 505 & table 3.)

As to the second group, it was defined as follows:

(1) Onset of upper respiratory irritative symptoms occurs within 24 hours of initial exposure to MITC and lower respiratory symptoms occur within 1 week of initial exposure.  (2) Persistent worsening of asthma symptoms subsequent to the spill usually with changes to medication regime, with symptoms lasting more than 3 months.

(*Id.* at 502.)

In the Cone study, persistent worsening of asthma symptoms were determined in at least two ways: by the screening of past medical records of the study subjects to determine that symptoms were over the baseline of symptoms experienced prior to the spill and by spirometry testing.[6]  (*Id.*

---

[6]Spirometry testing usually measures the volume and speed of air flow through the lungs against predicted values for healthy subjects of a like classification (*i.e.,* height, weight, age and

as 501-02.)  The study was also based on exposure modeling which predicted subject exposure to MITC of between 140 to 1,600 parts per billion for a three-day period.  (*Id.* at 506.)  This is significant in terms of the toxicity data.  The modeling was done consistent with the size of the spill and the reports of nearby residents that the spill omitted a foul odor.  MITC has an odor detection limit of 100 to 500 parts per billion.  (*Id.* at 501.)  As the exposure climbs toward 10,000 parts per billion, animal subjects have experienced irritation of the eyes and respiratory track.  (*Id.*)  For whatever reason, cats are extremely sensitive with mucous irritation occurring at levels as low as 70 parts per billion.[7]  (*Id.*)  MITC has also been shown to be corrosive–a skin and eye irritant in rabbits.[8]  (*Id.*)

Aside from the Cone study, the Government has also documented two cases of accidental metam sodium exposure in connection with chemical spraying of sewers to control tree roots.  Notice of Intent to Cancel Registration, 59 Fed. Reg. 48430, 48432 (Sept. 21, 1994).  In one of those cases,

---

gender).  The Cone study included subject data for forced vital capacity (the change in volume of air in the lungs from complete inspiration to complete expiration) and forced expiratory volume in first second (the volume of air expelled in the first second of a forced expiration following full inspiration) measured both in raw data, as a percent of predicted normal readings, and as the fraction of FEV-1/FVC.

[7]This statistic is not surprising given than metam sodium when injected orally to cats results in a lethal dose at 100 mg/kl and intoxication at 50 mg/kl.  (Hazardous Substances Data Bank 5.)  This statistic is associated with the oral use of carbathion, another term for metam sodium.  The legal dose statistics recorded on the Material Safety Data Sheet at page 2 were much higher for humans.

[8]Federal regulations dealing with hazardous substances define a substance as "corrosive" if it causes visible destruction or irreversible alterations of living tissue by chemical action. 29 C.F.R. § 1910.1200, App. A definition 2 (2004).  In making such determinations, laboratories typically use testing data for animal subjects such as rabbits.  *Id.*

in Los Alamos, New Mexico, residents of a home which received the backwash of a sewer treated with metam sodium reported some respiratory injury. *Id.*

Now back to Mr. Kolesar. Because of the toxicity classification of metam sodium, Plaintiff's employer provided him with a Material Safety Data Sheet ("MSDS") within the meaning of 29 C.F.R. § 1910.1200 (as well as a chemical safety training program and safety equipment). The MSDS stated that appropriate safety gear included safety glasses, a respirator, and rubber gloves. (MSDS 2.) It further provided that when working with hoses and in other tasks associated with chemical exposure, the employee should wear Personal Protective Equipment (a chemical suit, *etc.*) (*Id.* at 3.) It also advised that an exposed worker should be immediately cleansed with water and have his or her eyes washed, should don clean clothing and should seek immediate medical care in the event of suspected poisoning, eye exposure or symptoms of inhalation injury (nausea, headache, difficulty breathing, *etc.*) (*Id.* at 2.) Although the information on the sheet was furnished by the employer (the trucking company), the technical data on the sheet was furnished to the company and its employees by the manufacturer. (*Id.* at 1 (manufacturer's address) and 3-4 (manufacturer's disclaimer).)

Now to what Thomas Kolesar did on September 22, 2001 involving metam sodium. The following factual history is taken from the record interpreted in a light most favorable to Plaintiff, even though some of these facts (which are admitted) are not beneficial to Plaintiff. Plaintiff picked up a load of Nemasol 42 (the register trade name for the metam sodium liquid fertilizer) in Cadet, Missouri and transported it to Defendants' facility in Plainfield, Wisconsin. (Kolesar Dep. 193.) When Kolesar arrived at Defendants' facility he was met by Defendants' employee, Bryan D. Cullen. Bryan Cullen was wearing his special Personal Protective Equipment. (*Id.* at 222-23.) Kolesar

6

likewise knew from his reading of the MSDS that Personal Protective Equipment ("PPE") was required when he used hoses to empty his load because the liquid was corrosive. (*Id.*) Kolesar was dressed in street clothes--not Personal Protective Equipment[9]--and was allegedly told by Cullen that it was "no big deal" that he was so dressed. (*Id.* at 221, 223.)[10]

Kolesar and Cullen connected the hose linking the truck and receiving tank. Kolesar turned on his pump to pump the liquid into the receiving tank. During unloading, the metam sodium began leaking from the hose fitting and Kolesar, on several occasions, tightened the hose fitting with a wrench to stop the leak. (Kolesar Dep. 225.) In the process, metam sodium spilled on Kolesar's boots and gloves, turning them white; Kolesar then discarded the wet chemical proof gloves in favor of latex gloves. (*Id.* at 225-28.) At the time, another truck pulled into the unloading area and its driver got the attention of Cullen. (*Id.* at 229-30.) When Kolesar had finished pumping, he yelled to Cullen (some 25 feet away) that his truck was now empty. (*Id.*) Kolesar then began shutting off valves before disconnecting the hose fitting. (*Id.* at 231-32.) Although Cullen was still talking to the other driver, Kolesar assumed that he had closed off the valve to the receiving tank. (*Id.*) This assumption proved false and when Kolesar uncoupled the hose fitting, he ended up doing a dance with a flailing fertilizer hose, which sprayed his pants, hair and arms. (*Id.*) This caused Cullen to jump and shut off his valve. (*Id.* at 233.) In the process, Kolesar had drenched his pants and arms. (*Id.* at 240-41.) He also had spilled a little fertilizer on his shirt and felt tingling on his face. (*Id.*)

---

[9]According to Kolesar, he did not have proper PPE with him at the time, though he was also trained by his employer that he could refuse to load, offload or transport materials if he did not have proper PPE.

[10]Cullen's version of that interaction is that he told Kolesar to wear his PPE, but Kolesar declined. (Cullen Dep. at 72, 79, 82-83.)

7

Cullen also noticed some specks of fertilizer on Kolesar's face and told him so. (Cullen Dep. 102 & Ex. 12.)

After the spill, both Cullen and Roy Duncan urged Kolesar to spray off with water. (Kolesar Dep. 242-44.) Kolesar initially declined because he was irate that (in his judgment) the wash off facilities there were inadequate,[11] but he then washed off his hands, arms and face at the water source. (*Id.* at 242-43.) Kolesar then pulled his truck around to a nearby bathroom where he washed off more thoroughly and changed into fresh clothing. (*Id.* at 247, 250-55.) He did not smell the odor of MITC at the time. (*Id.* at 253.) During that process, Kolesar experienced symptoms of metam sodium poisoning–nausea, watering eyes and difficulty breathing. (*Id.* at 253.) Kolesar gave his exposed clothing, including his boots, to Cullen to discard, and then drove away shoeless. (*Id.* at 255-56.)

Before Kolesar left the facility, he called his supervisor from his cellular telephone to tell him that there had been a chemical spill; Kolesar did not then seek medical treatment, though he knew it was advisable to do so. (*Id.* at 256-57.) Kolesar also told his supervisor that he was driving to a truck stop to shower. (*Id.*) On the way to the truck stop, Kolesar was vomiting and called his supervisor again to report his illness before calling 911 to seek medical aid. (*Id.* at 261, 276.) He met an ambulance at the Petro Truck Stop in Portage, Wisconsin and was taken to a hospital nearby, Divine Savior Hospital. (*Id.* at 265; Dep. Ex. 35.) At that time, he was not experiencing shortness of breath. (*Id.* at 271-72; Dep. Ex. 35.) The hospital records reflect that he was immediately showered and eye-washed in the Emergency Department. (Emergency Report 2.) He was also treated overnight for slight shortness of breath with an Albuterol nebulizer, but was asymptomatic

---

[11]The record does not otherwise support this characterization.

at the time of discharge. (*Id.*; History and Physical 1-2.) He was discharged from the hospital the next day and immediately cleaned up his truck's driver's compartment and sleeping compartment. (Kolesar Dep. 271-72.)

After his discharge, Plaintiff sought medical care in his home town of Pittsburgh, Pennsylvania from a chest specialist, Dr. Taiwen Chen, for RADS. Her conclusions and the conclusion of Plaintiff's expert Ronald Schaible will be discussed below. Plaintiff also filed suit for workers compensation against his former employer, which suit was settled and is no longer pertinent to the outcome of this suit.

**STANDARDS FOR SUMMARY JUDGMENT**

Defendants' Motion is brought pursuant to Federal Rule of Civil Procedure 56. Under the language of Rule 56©, summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The initial burden is on the movant to specify the basis upon which summary judgment should be granted and to identify portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden then shifts to the non-movant to come forward with specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). If, after adequate time for discovery on material matters at issue, the non-movant fails to make a showing sufficient to establish the existence of a material disputed fact, summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 323. While this analysis assumes the adequacy of discovery, a party cannot oppose summary judgment based on vague generalizations that

discovery has been inadequate.  Rather, under the language of Rule 56 and the case law of this Circuit, a party urging that discovery has been insufficient must file a specific affidavit establishing that "the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition." Rule 56(f); *Klepper v. First Am. Bank*, 916 F.2d 337, 343 (6th Cir. 1990); *Plott v. General Motors Corp., Packard Elec. Div.*, 71 F.3d 1190, 1196 (6th Cir. 1995).

In assessing evidence, credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions.  *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994).  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor.  *Celotex Corp.*, 477 U.S. at 323 (quoting *Anderson*, 477 U.S. at 255).  The factual record presented must be interpreted in a light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Rule 56 limits the materials the Court may consider in deciding a motion under the rule: "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits."  *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995) (quoting Federal Rule of Civil Procedure 56©).  Moreover, affidavits must meet certain requirements:

> [A]ffidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.  Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

Fed. R. Civ. P. 56(e).

In accordance with Rule 56(e), the Sixth Circuit has held "that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded." *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993).  Thus, in resolving

10

a Rule 56 motion, the Court should not consider unsworn or uncertified documents, *Id.*, unsworn statements, *Dole v. Elliot Travel & Tours, Inc.*, 942 F.2d 962, 968-69 (6th Cir. 1991), inadmissible expert testimony, *North Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1280 (6th Cir. 1997), or hearsay evidence, *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996); *Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994).

This is true even if the exclusion of expert testimony will result in the grant of partial or complete summary judgment against the proponent of such testimony. *See, e.g., Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 139 (1999); *General Elec. Co. v. Joiner*, 522 U.S. 136, 146-47 (1997); *Pride v. BIC Corp.*, 218 F.3d 566, 580-81 (6th Cir. 2000); *Down v. Perstop Components, Inc.*, 26 Fed. Appx. 472, 476 (6th Cir. Jan. 4, 2002). Thus, in a case predicated upon scientific evidence of cause, the analysis focuses in part on the gate-keeping function of the district courts to ensure that only "reliable" expert opinion that is helpful to the fact-finder in assessing truth is used. The pertinent standards for such evidence are defined by Federal Rule of Civil Procedure 702 and the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). The district court's assessment of which of the *Daubert* factors of scientific validity are reasonable measures of reliability in a given case "is a matter that the law grants the trial judge broad discretion to determine." *Kumho*, 526 U.S. at 139.

## CHOICE OF LAW

It is black letter law that federal district courts, when sitting in diversity jurisdiction, apply the conflicts law of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941); *Erie R.R. v. Tompkins,* 304 U.S. 64 (1938). To determine state law, the Court applies the following general rules:

11

> When a federal court interprets state law, the substantive law of the state in which the district court sits must be applied. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Jim White Agency Co. v. Nissan Motor Corp. in USA*, 126 F.3d 832 (6th Cir. 1997). If the state supreme court has spoken on the issue, its decision should be followed; if, however, the only precedent is from the state's intermediate appellate courts, the intermediate court's decision should be followed absent a strong showing that the state supreme court would act in a different manner. *Lawler v. Fireman's Fund Ins. Co.*, 322 F.3d 900, 903 (6th Cir. 2003).

*Derungs v. Walmart Stores, Inc.*, 374 F.3d 428, 433 (6th Cir. 2004).

In this case, the starting point for discussion is the Michigan Supreme Court's decisions in *Olmstead v. Anderson*, 400 N.W.2d 292, 304 (Mich. 1987) and *Sutherland v. Kennington Truck Serv.*, 562 N.W.2d 466, 471 (Mich. 1997). *Olmstead* is the case which established Michigan law as the presumptive favorite in any personal injury or wrongful death suit involving a Michigan defendant even if the injury occurs in a foreign state. This decision was prompted by a practical recognition of the difficulty of utilizing foreign law by Michigan courts. It was also a recognition that Michigan's interest in the property of its citizens was a substantial interest warranting protection. These interests, when taken together, were deemed sufficient reasons for usually applying Michigan law, notwithstanding the common law rule of *lex loci delicti* (apply the law of the place of the wrong).[12]

These aspects of *Olmstead* was made even more explicit in *Sutherland*. *Sutherland* described the legacy of the *Olmstead* holding as follows:

---

[12]The majority criticized such rule as being abused through the years by exceptions so as not to serve the purported interests of certainty or preventing forum shopping. Of course, for the purpose of analysis, the more interesting question is whether the rule created by *Olmstead* has been abused more so than the predecessor rule and whether the rule has otherwise served the interests of both the certain application of the law and justice.

> *Olmstead* provides the analytical framework for deciding this case.  That is, we will apply Michigan law unless a "rational reason" to do otherwise exists.  In determining whether a rational reason to displace Michigan law exists, we undertake a two-step analysis.  First, we must determine if any foreign state has an interest in having its law applied.  If no state has such an interest, the presumption that Michigan law will apply cannot be overcome.  If a foreign state does have an interest in having its law applied, we must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests.  *Id.* at 24, 29-30, 400 N.W.2d 292.

*Sutherland*, 562 N.W.2d at 471.  The *Sutherland* Court went on to hold that a car accident in Michigan involving Ohio and Ontario drivers did not involve competing interests of either Ohio or Ontario such that Michigan law would apply.  *Id.* at 473.

What is interesting in this case is that neither Defendants nor Plaintiff are citizens of the State of Michigan.  Defendants are citizens of multiple states, though neither Michigan nor Wisconsin.  Plaintiff is a citizen of Pennsylvania.  Plaintiff has argued for the application of Michigan law–because it is the law of the forum.  It appears that Plaintiff filed suit here because his former employer (not a party) is located here and because he had contacts with Michigan counsel.

In *Olmstead*, the Michigan Supreme Court did discuss the concern of forum abuse in abandoning the rule of *lex loci.*  It concluded that there were no such concerns where a plaintiff was suing a defendant in the defendant's home state.  This was because the choice of forum was dictated by the defendant's residence (which may be at times the only place wherein a defendant under the constitutional restrictions of *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) can be sued).  However, *Olmstead* did not favor forum shopping, which it observed can sometimes lead to a constitutional violation of the Due Process Clause.  Due process is violated when a forum arbitrarily uses its own law in a case in which the state has no significant contact or interest in the

13

litigation.  *Allstate Insurance Co. v. Hague*, 449 U.S. 302, 313 (1981).  *See also Sutherland*. 526 N.W.2d at 472 (citing *Allstate*).

In the instant case, no Michigan defendant is sued.  The only supposed interest of the State of Michigan (aside from the ease of applying forum law) is the possibility that Plaintiff's former employer (not a party to this suit) might assert a worker's compensation lien as to an award to Plaintiff.[13]  However, Plaintiff has himself, through counsel, admitted that he does not believe that the former employer has any such right.  (Reply, Ex. A, Answers to Request Nos. 1 & 2.)  This is because he has settled with the previous employer and the settlement does not preserve a lien against a future award.  (Defs.' Ex. M.)  Simply put, Michigan has no interest in applying forum law other than the simplicity of doing so.

Therefore, even applying the presumption afforded by *Olmstead*, this Court nevertheless finds that *lex fori* should not be applied.  This is a case, due to the lack of a Michigan party or interest, wherein the selection of Michigan raises the specter of forum shopping.  Furthermore, the application of Wisconsin law is rational and serves compelling state interests.  As the Michigan Supreme Court said in *Olmstead*, "[t]he injury state always has an interest in conduct within its borders, whether or not its citizens are involved." *Olmstead*, 400 N.W.2d at 304.  This is because each injury state must protect persons within its borders from negligence and provide them with reimbursement from tort feasors while at the same time protecting its businesses and workplaces against unfounded liability which would otherwise squander their assets, efforts and jobs.  If Wisconsin law is applied, Defendants are able to tailor the conduct of their workers in Wisconsin

---

[13]Plaintiff also argued that some of Defendants' offices and officers are located in Michigan.  This may be true but has nothing to do with the legal interests at stake in this suit.

14

facilities to an expected legal standard.  These facilities (which receive interstate trucking) serve truck drivers from distant places.  If each of those drivers could sue based upon their own state law or another unrelated state's law, then Defendants would indeed have extreme difficulty in legal compliance as well as the danger, foreseen in *Allstate*, of predicting the arbitrary application of foreign law.

As such, the Court determines that the interests of the State of Wisconsin, including its interest in avoiding the arbitrary application of foreign law, in this case justifies the application of Wisconsin law in preference to the law of the forum.  This decision is consistent with other Michigan authorities which have held that accidents outside of Michigan not involving Michigan plaintiffs should not be governed by Michigan law.  *Hall v. General Motors Corp.*, 582 N.W.2d 866, 871 (Mich. Ct. App. 1998); *Farrell v. Ford Motor Co.*, 501 N.W.2d 567, 572 & n.3 (Mich. Ct. App. 1993); *Isley v. Capuchin Province*, 878 F. Supp. 1021, 1024 (E.D. Mich. 1995).

## LEGAL ANALYSIS

Defendants' arguments are premised on both causation and contributory negligence.  First comes the subject of causation.  Plaintiff's claims in this suit that he has suffered a permanent respiratory disease–RADS–due to toxic exposure necessarily depends upon an application of Wisconsin law.  *See Glaser v. Thompson Med. Co.*, 32 F.3d 969, 971 (6th Cir. 1994) ("Sitting in diversity, we apply [state] law of causation.").  Wisconsin law provides that in certain areas of scientific complexity, cause must be proven by a qualified expert because the area "does not fall within the realm of ordinary experience and lay comprehension."  *Menick v. City of Menasha*, 547 N.W.2d 778, 782 (Wis. App. 1996).  Furthermore, the Wisconsin Supreme Court in *Jandrt v. Jerome*

*Foods, Inc.*, 597 N.W.2d 744, 757 (Wis. 1999) held that the continuation[14] of a toxic chemical lawsuit alleging a birth defect without obtaining the testimony of a qualified and supporting physician was frivolous.[15]  *See also Joiner*, 522 U.S. at 146-47.  This is because the effects of toxic chemical exposure are complex and not within the ken of ordinary experience.  As such, the Court determines that under Wisconsin law, for Plaintiff to support his claims that chemical exposure caused him permanent injury, he must educe supporting qualified expert testimony.  The next question is whether the testimony of Dr. Taiwen Chen and Ronald Schaible count as such.

This question returns the subject to the ambit of Federal Rule 702 and *Daubert* gate keeping. *Daubert*'s benchmark of "reliability" requires something more than the "the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146.

> "Although there is no single criterion for determining whether a specific scientific methodology is reliable, the *Daubert* Court identified the following factors as pertinent to the reliability of proposed scientific testimony:
>
> > the testability of the hypotheses (whether they can or have been tested); whether the expert's methodology has been subjected to peer review, the rate of error associated with the methodology, and whether the methodology is generally accepted within the scientific community.

*Pride*, 218 F.3d at 577 (citing *Daubert*, 509 U.S. at 593-94).

As for Dr. Chen's hypothesis that exposure caused RADS, it is immediately apparent that such conclusion is not readily testable.  Dr. Chen's conclusion was not subjected to peer review.

---

[14]The Wisconsin Supreme Court condemned the continuation of the suit, rather than its rushed filing, because in that instance the rushed filing without supporting evidence was due to the operation of the limitation period as well as belated consultation by the client.

[15]*Jandrt* also held that a claim of common law negligence for chemical exposure does not presume causation, but rather must be proven by a preponderance of the evidence.  *Id.* at 755.

Dr. Chen came to her conclusions by simple diagnosis and treatment of Plaintiff.  Dr. Chen examined Kolesar on October 8, 2001, took a medical history and had him perform a pulmonary function test.  At that time, Kolesar gave a history negative for prior lung disease.  (Chen Workmen's Comp. ("W.C.") Dep. 14.)   Based on that history and test results showing a moderate pulmonary obstruction, Chen diagnosed RADS.  (*Id.* at 52-53.)   At the time, her definition of RADS was consistent with the American College of Chest Physicians definition–which excludes persons suffering from prior serious pulmonary conditions, including asthma.  (*Id.* at 17; Peggy Brady Report 9; Kvale Report 6.)   She later changed the definition of RADS she was using, contrary to the specialist community, so that the definition did not exclude Plaintiff from a diagnosis of RADS because of his prior asthma.  (*See* Chen W.C. Dep. 102, 117 & 136; Chen Dep. 52-53.)

The diagnostic criteria she used for RADS[16] (which omitted an element required by the American College of Chest Physicians) is expressly not accepted by the relevant medical community. She adopted that different definition only after she learned that Plaintiff had a prior history of asthma including hospitalization–which would have excluded him from the accepted definition.  This gives her hypothesis all the appearances of a conclusion made for convenience (to support a pre-existing notion) rather than one supported by scientific fact.  This also means that such a diagnosis fails the usual test for a valid differential diagnosis.  Such a diagnosis is based upon the exclusion of alternative causes for disease. *See Hardyman v. Norfolk & Western Ry. Co.*, 247 F.3d 253, 261 (6th Cir. 2001). In this case, the requirements for a valid differential diagnosis are absent.

---

[16]As noted by Dr. Paul Kvale, the advent of Plaintiff's serious symptoms is also inconsistent with a RADS diagnosis, which is another element of the accepted definition of the condition.  (Kvale Report 6.)

It is noted that Dr. Chen relied upon the Cohen study and that such study, in the Court's judgment does provide, as to the study participants, a valid scientific basis for opining that MITC exposure had caused RADS in certain cases and had caused persistent exacerbation of asthma in other cases. This comparison, though, is not a compliment to Dr. Chen's conclusion. Her conclusion left out the scientific modeling performed in the Cohen study, which therein provided a basis for estimating the amount and length of MITC exposure. (Chen Dep. 50.)[17] *See also Reference Manual on Scientific Evidence* 419 (Fed. Jud. Ctr. 2000.) This is important because without the modeling, one could not conclude that sufficient MITC exposure was caused by the release of metam sodium, particularly when some steps (washing and new clothing) were taken soon after the spill to counter-act the exposure and before the likely decomposition of metam sodium to MITC. (*See* Peggy Brady Report 7, 10.)

In addition to those problems, there is also another fatal problem for Dr. Chen's conclusion. The Cohen study, to the extent that it gave diagnoses of exacerbation of pre-existing asthma, did so by surveying patients prior medical records and spirometry testing to establish that the lung condition was exacerbated because of the exposure. In the instant case, Dr. Chen did not do so–this despite Plaintiff's history of serious asthma and long history of cigarette smoking and HIV treatment.[18] The competing expert, Paul Kvale, M.D., did however review the medical history and the history of Plaintiff's spirometry tests. Dr. Kvale, based upon his training and long experience as a physician

---

[17]During her deposition, Dr. Chen agreed that she was not qualified to given any estimate of the amount of the exposure. (*Id.*) She also agreed that she was not a toxicologist and could not opine about the amount of a substance likely to cause injury. (*Id.* at 53.)

[18]After she made her RADS diagnosis, Dr. Chen did perform a bronchoscopy test, though such test was not intended to distinguish between illness caused by chemical exposure or simple asthma. (Chen W.C. Dep. 136-38.)

and pulmonary specialist and impressive credentials, is more than qualified to render expert opinions.  (*See* Kvale CV.)  Based on his review, he concluded that Plaintiff did not have RADS and that his asthma was not caused or aggravated by the chemical exposure at issue.  (Kvale Report 7.) The testing data relied upon by Dr. Kvale strongly supports such conclusions.[19] (*Id.*)  Given the defects in Dr. Chen's methodology used to reach those conclusions, the absence of supporting medical data and scientific literature, the absence of a valid basis for a differential diagnosis and the contrary scientific information and literature in the field, her conclusions as to causation of exposure-related pulmonary illness are wholly unreliable.  As such, they will be excluded as unreliable and unhelpful to the jury under Rule 702.  Such conclusions also do not provide a basis for denial of summary judgment since they are insufficient as a matter of law to show causation.

Regarding the Report of Ronald Schaible (Plaintiff's expert industrial hygienist), the concerns are different.  Schaible, who is skilled in workplace and occupational health and safety matters, does not, like Dr. Chen, purport to give opinions about causation or toxicology.  He admits that the pharmacokinetics of metam sodium, the symptoms of poisoning, the mechanisms of injury, the biomarkers of injury and the diagnosis of injury are matters beyond his expertise. (Schaible Dep. 30-31, 34.)  He is not a medical doctor nor expert in asthma or RADS.  (Schaible Dep. 34.)  Schaible thus admits that he is not qualified to give opinions about metam sodium causing RADS or any of Plaintiff's symptoms.  (Schaible Dep. 156, 180, 189-90.)  Instead, Schaible's opinions are limited to the opinions that Plaintiff's reported symptoms are "consistent with" possible consequences of metam sodium exposure.  (Schaible Dep. 87-90.)  *See also Minner v. American Mortgage & Guar.*

---

[19]This expert opinion was also shared by another defense expert physician, Kenneth Rosenman, M.D.  (Mar. 19, 2002 Rosenman Op. 2.)

*Co.*, 791 A.2d 826, 865-66 (Del. Super. Ct. 2000) (holding that industrial hygienist was unqualified to opine as to causation).  The obvious defect of this opinion, in any event, is that under Rule 702, it is not helpful to the jury because it does not make more likely or not a conclusion that Plaintiff was injured due to chemical exposure.  As such, the content of the testimony is unhelpful and is properly excluded under Rule 702 and also under Rule 403 as a waste of court time.  Furthermore, such testimony, even if admitted, does not provide a basis for denying Defendants' summary judgment motion since cause is not established on this record.[20]

While the Court's conclusion about causation effectively ends this suit, it is also worth commenting on another defense urged by Defendants–contributory negligence.  Under Wisconsin Statute Ann. § 895.045, a plaintiff may not recover from defendants when he is more negligent than those defendants.  Further, when undisputed facts indicate that "plaintiff's negligence is, as a matter of law, greater than any negligence on defendant's part, it is the court's duty to so hold."  *Peters v. Menard, Inc.*, 589 N.W.2d 395, 404 (Wis. 1999).  Similarly, Wisconsin has recognized a public policy exception in certain cases which bars recovery by the negligent as a matter of law.[21]  *Stehlik v. Rhoads*, 645 N.W.2d 889, 904 (Wis. 2002).  For example, in *Stehlik*, the Wisconsin Supreme

---

[20]This resolution makes unnecessary any further analysis of Schaible's testimony regarding breach of care.

[21]"'The question of whether public policy considerations preclude liability is a question of law' and is determined by application of the following factors:
> (1) the injury is too remote from the negligence, (2) the injury is too wholly out of proportion to the tortfeasor's culpability, (3) in retrospect it appears too highly extraordinary that the negligence should have resulted in the harm, (4) allowing recovery would place too unreasonable a burden on the tortfeasor, (5) allowing recovery would be too likely to open the way for fraudulent claims, and (6) allowing recovery would enter a field that has no sensible or just stopping point."
> *Stehlik v. Rhoads*, 645 N.W.2d 889, 903-04 (Wis. 2002) (citations omitted).

Court held that when an adult ATV rider voluntarily decides to go without his safety helmet, he is more responsible for that decision than the ATV owner such that liability cannot be imposed on the latter. The present case makes for a nice parallel. While Defendants did not manage this chemical delivery perfectly, the moving and greatest cause for the spill and the greatest part of the fault is upon Plaintiff's shoulders. He decided, without checking with Cullen, to disconnect his hose. He decided to forgo immediate cleaning. He decided to engage in the delivery without appropriate PPE. And he decided to forgo medical care until he experienced symptoms of illness. Under such conditions, he is more liable than Defendants as a matter of law and cannot prevail against them. As such, summary judgment should also be entered in Defendants' favor due to the defenses of comparative negligence and the public policy.

## CONCLUSION

For the reasons given, Defendants' motions will be granted and summary judgment entered in Defendants' favor.

DATED in Kalamazoo, MI:
    January 26, 2006

/s/ Richard Alan Enslen
RICHARD ALAN ENSLEN
SENIOR UNITED STATES DISTRICT JUDGE

21